May it please the court, Kenneth W. Starr for Braun Medical, and I will do my best to reserve five minutes for rebuttal. In this diversity case involving a very important medical device, there are several points that we think are vital to the appeal. Mr. Starr, before we get to the merits of the case, or lack of merits of the case, let me ask you a foundation question. As to whether or not this court has appellate jurisdiction, or if we don't, do we have to dismiss the case? There was a remittiture order entered into. That order was never accepted or rejected. If it were accepted, of course, your friend across the aisle could not appeal. You could, but they couldn't. If it were rejected, the only thing the appellee could have done was to retry the case. Given that scenario, don't we have before us an interlocutory appeal, which is not sanctioned under 1291? Only, Judge Cowen, to the extent of the remittiture. At a post-trial motion adjudication, the court did indeed, as you say, and my brothers on the other side disagreed, but I think that the court did in fact grant a remittiture. The court used the word remit. The court engaged in a remittiture-type exercise that we're very familiar with. It also then said in its bottom line that the motion for remittiture, bronze motion for remittiture, is granted in part. However, the court did enter a final judgment with respect to the assignment of the 451 patent, which is fundamentally, of course, why we brought our declaratory judgment action to begin with. There is a final judgment there, but I agree that my brother, I shouldn't say I agree, I would propose that my brother were this case to be returned, and that is our fundamental submission today, that for a variety of reasons the case should go back to Judge Brewster, and if I could, there Mr. Rogers has to make that determination. Does he accept that remittiture, or does he go for a new trial? We believe, may it please the court, that a new trial is necessary for a variety of grounds. Let's play this out. If he accepts a new trial, what does that do to the equitable action, the equitable determination defined by the court with respect to the assignment of patent? In other words, if we say that the district were erred in not affording that option on a remittiture, what does that do to what you've called the caboose of this? For separate reasons, I believe the caboose trial has to go back as well. Right. But taking it one step at a time, if we were to reverse on a remittiture, what does that do to the court's equitable findings? I think that the entire case has to go back. If he opts for a new trial under remittiture practice, that's his judgment. But I would also guide the court and urge the court to consider, as I know the court will, our caboose trial arguments, namely, that was a jury trial. There's something that's very foundationally missing here, which is the jury. It was the jury. It was the jury that should have heard the evidence with respect to the relationships between three entities, Rogers, Braun, and then V.I.R., the engineering firm. The entire case of the other side is based upon this. Mr. Rogers, responding to Braun's criticisms of Rogers' patent, that it wasn't working out, hires V.I.R. Well, Mr., we're getting into the merits of the case. Yes, we are. I'm sorry. Okay. And my fundamental question is this. Can we speak to the merits of the case? You may be right. You may be wrong. But if our hands are tied, if we have before us an interlocutory appeal, i.e., there was a remittiture order entered, that remittiture has not been accepted or rejected. We cannot accept it or reject it or give you or your adversary in this court that option. Yes. Only the district court can. Yes. And if that is an interlocutory order, an appeal one, and if it isn't, I don't know. I've never seen one that is not. It seems to me that we cannot deal with the caboose. We cannot deal with anything in this entire shooting match unless the case goes back And if your adversary, first of all, accepts the remittiture, he can appeal. You can appeal. If he does not accept it, neither you nor he can appeal. It has to be retried. And after that trial, they can come up and say that there was error in the remittiture and they want to go back to the original damages that were established. But in order to get to the merits of your argument or their argument, we have to first determine whether or not we have appellate jurisdiction. And as I understand the remittiture practice, and it's not even controversial, we cannot touch it unless the district court first announces and there has been an election made as to whether or not there's going to be a new trial in the district court. For us to speak to the points which you or they raise on appeal is to be strictly an opinion which is without a case, so to speak, that would be the quintessential advisory opinion. Judge Callan and members of the court, I would draw a distinction between the cross appeal and our appeal. We have a judgment that is a final judgment entered against us that includes the assignment of the 451 patent. We are entitled, I believe, to file, and we did, a timely notice of appeal and to have that appeal heard. I do quite agree that the cross appeal, to the extent that the cross appeal is seeking to call into question the remittiture, that is improper, and we have so argued. So we agree, but we do not think that the, if I may call it that, the appeal in chief is thereby non-jurisdictionally proper here. To the contrary, because of the nature of the judgment, we had no choice but to file a notice of appeal and, in fact, to brief the issues and then to determine, obviously, what our response would be to their cross appeal. They did not have to cross appeal. So that issue of remittiture would only be here, Your Honor, had, it is only here by virtue of the cross appeal. So I think the cross appeal does, in fact, raise these 1291 final judgment orders and issues, but not ours. Not ours. But if we spoke to your appeal, to some extent, the points in your appeal are, I don't want to say derivative or corollary, but they are involved inextricably with the, with your adversary's appeal. Well, Your Honor, in terms of the administration of justice and what makes sense, I will simply say we are here to say the case needs to go back. It needs to go back for a new trial for a variety of reasons, and some of them, from our perspective, are Seventh Amendment. The judgment in our judgment should not and cannot properly stand in its present form. Let me ask the question a different way because I want to make sure I understand your position. Assuming that we were to hold that reversal was required because of the remittiture issue, do you view the equitable determinations of the court to be a freestanding issue that would not be subsumed in that order? We believe the short answer is yes with an important qualification. We believe that the, quote, equitable determination was, in fact, a violation of the Seventh Amendment. That is, his determination, his adjudication of facts as opposed to the order itself. We have various arguments under California law, as the court is very familiar with, as to why we think that that is an impermissible remedy, it being the reassignment. But if I may, one of the foundational issues in the case, because this began, of course, as a trade secrets case, and if I may address the merits of that, one of our fundamental points that we would leave the court with today for its consideration is that under the law and under common sense, under Hornbook law, under this court's decisions in IMAX and MAI systems, there is a requirement that the trade secret be identified with particularity, with sufficient particularity. This is not an unfair requirement. This has nothing to do with the values of notice pleading. It has everything to do with fundamental fairness. And that's what this court was getting at in MAI systems, which Judge Gregerson served on the panel, as in 1993, and then later in IMAX. And the IMAX case, if I could spend one minute of my time on the IMAX case. In IMAX, the IMAX lawyers stand up and say, Your Honor, to Judge Jensen, look at Exhibit U. It is so specific. It refers to dimensions and tolerances, and that's technology. Technology here is different. Judge Snead said, That's not enough. You've got to point with particularity. Dimensions and tolerances is simply too generic. Identify it with particularity. And grant it summary judgment. It's not a discovery case, as my brothers would suggest that it is. It's a summary judgment adjudication. It's a merits adjudication. Why? Because, and then affirmed by a panel of this court on appeal, and that was the end of the case. You needed to identify what? The 6.22 dimension and tolerance. And that is so, as Milgram teaches in the trade secrets horn book, it is necessary for two vital reasons that go to fundamental fairness. The defendant has to be able to know prior to trial and during trial what it is that is at issue. Here, my brothers on the other side, clearly concerned with the possibility, and we believe likelihood, of a grant of summary judgment against them if they stayed the course. Staying the course. Evolving nature of the trade secret at issue. And so, as we see throughout the litigation, the trade secret definition, which began with particularity in the first amended counterclaim, and we lay this out in the briefs, phase one costs $15,000. They pointed, Mr. Rogers pointed to drawing number one and drawing number three. That arguably satisfies the IMAX requirement. But during discovery, during summary judgment, the other side says, that's not the trade secret. We're not limited to that. We're limited only by all of the combinations that can be derived from those five. And we have given the court the calculation. I don't think my brother is going to object to the calculation. That combination gives us at least, or that approach to trade secret definition, gives us at least 33 million combinations. Are you suggesting, though, that it's almost structural error if the judge does not instruct the jury as to the, with particularity on this issue? No, Your Honor, it is way before. It's not a jury issue. A question of note, certainly a question of note, is a pleading question of discovery. But now we're at trial. The judge makes statements in chambers that are not helpful and may mislead you. And then the jury gets a proper jury instruction. Why isn't that harmless there? Well, Your Honor, the jury is not obligated. If I could, on the trade secret, the process and procedure is so vitally important. The trade secret has to be told to us, not to the jury. It's not up to... Well, if you... Can you defend the case based on what was disclosed to you? We could not because of what we have... And, by the way, the trial judge saw fit, and this goes to the definition of trade secret, to not admit evidence of the... You claim that his definition affected the evidence which he admitted and didn't admit. With all due respect to Judge Brewster, he got the meaning of trade secret wrong. He said the trade secret can, in fact, be a combination. And we put before him, Your Honor, in the motion in Lemony. So this is not latter-day inspiration as to error below. In the motion in Lemony, number 7, we specifically said the other side started out by pointing to Design 1 and Design 3. They've moved from that. If I may say, there's a reason they moved from that. The 451 patent is not Design 1, and it's not Design 3. And they're on expert testify to that. They have a powerful, and I believe quite dangerous, generative theory. Namely, we can claim very broadly mix-and-match combinations. What is their case citation for that? They've come up with one case. We've come up with Ninth Circuit law. They've come up with one case from the Northern District of Illinois that they say justifies mix-and-match. We told the judge in the motion in Lemony they're trying to mix-and-match. We can't try that case. It's utterly unfair. We don't know what is at issue if you can mix-and-match anything and everything. And when one then analyzes their one authority, the Thermadon case, the Thermadon case involving McDonald's ovens, you see a careful reading of that. The court will discern. The judge, their district judge, not biting on this court, Northern District of Illinois, in fact, engaged in an IMAX reasonable particularity kind of analysis. That is so foundational. But if I could just say two other things as my time evaporates. One, there were issues going to in light of the very important issue of ownership. My brother's claim undiluted and undefiled ownership in phase one. That was really the theory of their case. Now, in December of 1993, outside the statute of limitations, three-year statute of limitations, outside the statute of limitations, Mr. Rogers returns. This is a telltale. It's just one example. I'm not retrying the case. I'm talking about a statute of limitations issue that should have gone to the jury. The jury was not permitted to even take into account whether this was timely or not. We moved for summary judgment on statute of limitations. What was that return check? Recall, Mr. Rogers paid the princely sum of $15,000. That's fine. It was his money. He was eager to move forward. We credit him for that. But then there was an issue. Well, who should pay? Who should contribute to that? Braun then, in March of 1993, wrote the check for one half. We refused to pay for the full tab, but we said half is fair. Mr. Rogers held on to the check for nine months. And then in his testimony at trial, there were issues with respect to Mr. Zimmer's untimely death, his co-inventor. He held on to the check, and that's the reason given to Braun, were there issues with respect to the estate. But in his testimony at trial, he demonstrated the relevance of this issue going to the jury. He said, ownership, we did not want there to be an issue with respect to ownership of Phase I. Your Honor, it's undisputed, Braun paid every cent, $266,000, for Phase II. It paid for all of Phase III. It has paid over a million dollars just for the machining. It has worked on the Ultrasight, which is very important in this HIV-infected world. It's a very important device. And the inventors of that device were VIR. And the inventors of that device in Phase II, and this was not permitted to go before the jury, the jury didn't get to decide this. We paid the bill. Claude Vidal testified, who is Vidal Engineering. He's got a terrific group of engineers in Santa Barbara. We credit Rogers for having, yes, this is a good group. And we said, we can work with this group. We can work with this engineering firm. So we enter into, what, purchase orders that they knew about. Mr. Rogers knew about it. He was also present for the interim reports. We paid for it under industry practice. It's ours, not theirs. That's what should have gone to the jury. Well, yes, the question is whether, to what extent did Phase I enter the argument from your adversaries that Phase I affected and was part of or in some way. But, Your Honor, that was not their theory at trial. It's now their theory. They would have you believe, well, it was the designs in Phase I. But they lose because their own expert said that 451 is not, in fact, any of the drawings, those five drawings in Phase I, and all of those drawings brought together, $15,000, several weeks, publicly known elements. Undisputed, publicly known elements. That's when the real work began in Phase II, for which Braun paid for. We should have been able to try that before the jury. I thank the Court for its attention. I'd like to reserve my 20 seconds. Very well. Thank you. Good morning. May it please the Court. Robert Keyes, I represent Bobby Rogers and Rozzi. We frequently refer to the party as Rogers in this case. Could you initially address the jurisdiction of this panel to even hear this case and not just dismiss it? Yes, Your Honor. Whatever we call it, Judge Brewster was very clear as to what he was doing on the grant of the remediator. Judge Brewster said, if the request was brought pursuant to a motion for new trial, the Court may grant the defendant's motion for a new trial, or deny the motion conditioned upon the prevailing party's acceptance of a remediator. The Court then went on to say, if the request was brought pursuant to a motion for judgment as a matter of law, the Court may remit the damages without giving the prevailing party the option of a new trial. The Court very specifically denied Braun's motion for a new trial. The Court specifically granted Braun's JMOL and reduced the damages. What Judge Brewster essentially did was he said, as a matter of law, that Rogers could not recover unjust enrichment damages, could only recover actual damage, and then calculated what he believed to be the maximum amount of actual damage. That was a legal ruling. It's interesting that along with that ruling, and we've cited his statements in our brief, the Court made several, at the very same time he was taking argument on this, several very telling comments when he said that if it's true that a wrongdoer shall not profit from his wrong, then he found that there was substantial evidence supporting the $16 million that were awarded for past damages. He said the evidence was that $16 million was on the lower end of the scale of past damages. Apparently he was troubled, and I'm not sure why, by the provisions of 3426.3, which say, in a misappropriation case, the damages are actual damages, unjust enrichment to the extent that they don't duplicate actual damages, and only in a default situation where there is no proof of either of the former, only then is it of royalty. What he did, though, was he wiped out what the jury was given under proper instruction, which was unjust enrichment, and awarded actual damage. He acknowledged that the case of Rogers for damages was largely based on unjust enrichment. I would point out not entirely. The only evidence of actual damage was that given by Dr. Buckley, who testified to the value of the patent in 1994, which he calculated at $11.6 million, I believe it was, and with interest at the time of trial would have been $21 million. So I guess your short answer is you think it's a legal conclusion, not a remediator action? It is a legal conclusion, and he's very specific in his order that that's what he did. He did not offer a new trial. My colleague indicated that Braun had no choice but to appeal. Neither did we. There was no discussion of a new trial. Again, Braun. Your position is he parsed the jury's award of damages and found some was justified and some was not justified under the evidence before the jury, and he made that legal conclusion. That's your argument, as I understand it. I think it is. All right. How can he do that given the Seventh Amendment? It's not for the judge to make a legal determination as to what is the appropriate damages for unjust enrichment, for fraud, or for anything else. And if there's an improper jury award because it includes an element which is improper, the judge cannot excise out what the jury picked as the appropriate damages. Either way the argument goes, it seems to me that what he did was trying to cut the baby here and issued what was, we've all done many times, remit the damages which he felt were excessive for whatever reason. Well, I agree with the court that I don't think he can do what he did on the record in front of him. There is no assignment of error in the jury instructions, no assignment of error in the interrogatory sent to the jury, no assignment of error as to the findings of the jury here. There is no claim that any Braun requested jury instruction was not given. There is no claim that any special interrogatory to the jury requested by Braun was denied. Well, the claim is more fundamental. The claim is that they were never put on notice as to what the trade secret was, that you had an IMAX, you had whatever million dollar combinations, and that number one, phase one had no trade secrets in it. It had nothing that wasn't already in the public domain, that was in the prior art, and that the ultimate invention could not possibly be inclusive of any trade secret, because phase one had no trade secret, and the jury was never told what the combination is of phase one, which was the secret, which is to be protected from being filched on. That's their argument, is what I'm saying. That is their argument, and I heard it at length in the trial. What's wrong with that is, first of all, IMAX is a case that deals with a discovery statute in California. In IMAX, they went, I believe they went through four or five or six successive attempts to get the plaintiff to state the nature of the trade secret. In IMAX, there was a patent, and the plaintiff had done improvements on that patent by way of certain specific dimensions that would be applied to the device that was described, but he wouldn't tell, apparently wouldn't tell the other side what those dimensions were. Why is that different from this case? You had a very loose definition. Go ahead. If I may differ, we had a very tight definition. It was 16 pages. It was the phase one report with drawings, each of which was testified to be a unique drawing, each of which was established to be a trade secret. It was not known in the industry, and it had economic value, and it met the definition of 3426. Is that a little general? I mean, it seems to me your brief doesn't say what the secret is of those phase one and its development into further phases. Even on appeal, you're not saying what the actual trade secret is. The trade secret is the report. It is the diagrams along with the heading. For example, type one, it states some of the features, as engineering drawings do, such as three-part assembly, debuggling may be necessary, but it is a diagram, an engineering concept drawing. Well, a diagram can't be a trade secret unless it has something which is unique. It's not known. It is. And the testimony from Professor Atkinson, our expert, the testimony from Mr. Sheehan, their expert, was that none of these diagrams were known in the prior art. Judge Brewster dealt with this at length in hearings, that the trade secret, even though it may be composed of building blocks known in the industry, the particular combination in the case law is in concurrence. The trade secret is in the combination of those building blocks, just as the words of a book are all in the dictionary, but the book isn't. It's how they're put together. And what is the combination of this that makes it a trade secret, a particular combination? The five types contained in the phase one report. Well, you can't take a dictionary and say we claim all the words in the dictionary, and therefore you can't write a copyrighted piece. Correct. They have a right to know what combination you're litigating and what the trade secret is. And the district court asked you directly, and you gave a generic answer. Your briefs give a generic answer. It's difficult to say, looking at the trial, what the precise trade secret was that they took. Now, if you're trying to claim a trade secret protection of all the building blocks, I think that goes far beyond what we've allowed or anybody's allowed as being protective. Let me be very clear. We are not claiming trade secret in the building blocks. We did not claim it at trial. We are claiming the concept drawings created by the VIR engineers that are contained in the phase one report. Two things I should say, because the mix and match method. What combination of the drawings are you claiming that constituted a trade secret? I mean, once you get beyond the drawings, then all you're into is combination and mix and match, and we don't know what you're talking about, really. Well, we're not into combinations of mix and match, and maybe I could address that for a moment. That the types listed in phase one could be mixed and matched is merely an attribute of the types. At no time did we or the court say that there was a sixth or a seventh or an eighth or a two millionth combination on which we claim a trade secret. At no time was that ever done. If someone came with diagrams of three concept vehicles, they all have tires, wheels, transmissions, and so forth, an attribute of those is that they presented it to GM might be that the transmission from type two also fits in type one. They're not claiming a new type four, but merely describing an attribute. That's all that was ever done here was that an attribute of these diagrams is that certain of the elements can be mixed and matched. But we should also be very, very clear, that was never mentioned to the jury, either in jury instructions or in argument of counsel, nor was it in the jury verdict form. The jury verdict form was very specific. Do you find trade secrets in phase one? Well, let me see if I can understand it. Maybe I'm not understanding your answer. If I understand your position, you aren't claiming trade secrets in the building blocks themselves. No, we are not. You're claiming a trade secret in the combination, but you didn't argue what that combination was, right? No, we did. So what did you just say to me when you said we didn't argue at any time what the combination was? We argued the combinations are type one. That is a combination of tires, wheels, and whatever. That is a combination of, and the experts testified how many there were. There may have been 15, there may have been 20 separate building blocks. But type one is a trade secret. Type two is a trade secret. A separate, distinct concept drawing. Type three is a trade secret. And the experts, both of them, were questioned at length as to the progression, in this case, from type one to the ultrasound. The jury was asked, there's a complicating factor here in that the VIR engineers were present throughout this. If Vaughn had stolen in the middle of the night into the VIR offices, broken in, entered, and stole this report and took it back to their engineers, and based their further development on the trade secrets contained in the diagrams, in the concepts that were prepared through Rogers by VIR, we'd still have the same claim we have today. What in fact they did was they stole it in a different fashion. And in addition, they stole the consultants of Rogers to bring it to fruition. But we still go back to the trade secret. The court instructed the jury that its verdict had to take into account the degree to which phase one, in this case, type one, the drawing, contributed to the patent. And the jury's verdict found that it was substantial, the only inference that can be drawn from the $16 million award. The court concurred. But there's a very specific statement of what the trade secret is. It's physical, and it's placed in front of them. Unlike IMAX, where in IMAX, the trade secret was dimensions and tolerances, and they never said, here it is, this dimension from here to here of .16 millimeters or whatever it might be. They never said that. Well, in this case, where is it set as to what combination or reshuffling of the data is the trade secret? No combination of this is the trade secret. It is the trade secret in and of itself. And your position is because it wasn't in the prior art, because it's not in general knowledge, that the further development of that entitles you, of your property, phase one, entitles you to the verdict. For two reasons. If we take type one, this is a unique combination not known in the art and was presented as a trade secret. Your testimony is that it was not known in the prior art. It was not. And it isn't mine. It was Dr. Antonsen and Mr. Sheehan. There was no contradictory evidence. It was not known in the prior art. The building blocks are not, this is not one of the building blocks. This is composed of 20 building blocks put together in a unique fashion. A piston, for example, is one of the elements in any of these valves. That is one of the building blocks. And other devices had pistons. Other devices had walls. Other devices had springs. Other devices had ports and openings. Those are the building blocks. This is not a building block. This is the trade secret. And this is the trade secret that was presented to the jury. This is what the jury found very specifically was the trade secret. And actually in four of the jury interrogatories, the court was very clear. You guys are arguing that they were not aware of the specific trade secrets involved. And that you could take those numbers and a mathematician and come to, what, a million or so combinations. We did not claim a million combinations or any others. It's interesting that the appellants say that now. But under the California discovery statute, they say discovery shouldn't even begin, Ron, if you don't know what the trade secret being claimed is. They began discovery without objection. During discovery, they never said, neither we nor they can proceed with this discovery to the court, because they haven't met the gatekeeper role of establishing what the trade secret is. They didn't do that. They went for five years in this litigation without doing that. Today they say they don't know what the trade secret is. But they had no problem, none whatsoever, doing discovery on phase one. Most of the discovery was directed at phase one. Sure, but you didn't show what part of the phase one or attributes were actually incorporated in the patent 451, right? There was extensive testimony from Dr. Atkinson and Mr. Sheehan on that issue. Well, let me just to back up, the lowering of the jury award from what, 16 to five? Correct. What was the other, what was the $11 million that was taken away from you? That was for what? On Justin Richman. Are you claiming that, as the district court saw it, that the $11 million for Justin Richman was not within the evidence that was presented? No. No. In fact, he stated to the opposite, if I may. I thought that was the heart of your case, that they had made all this money off of your trade secret, and therefore you were entitled to this money. It was at the heart of our case. The court said in ruling on motions, if it is true that unjust enrichment as a matter of law is any profit made from the wrongful conduct, then it seems to me the verdict on compensatory damages portion is supported by substantial evidence. Well, if that was his ruling, then how could he take $11 million off the? Because what he did in essence was say, was negate the UTSA. He said, Rogers, you can't get unjust enrichment. I will only allow you to recover actual damage. That's where the error in law occurs in what Judge Brewster did. The fact is that the UTSA specifically authorizes unjust enrichment, and the case law is replete, California as well as national. Well, he remitted the $11 million, but your testimony was substantially more than that. You were entitled to substantially more than $11 million for unjust enrichment. Our testimony as presented was that Ron said their past profits were $11 or $12 million. Our evidence was that they were with interest $23 million. That's the basis for the $16 million award, which is pretty much smack dab in the middle of what the two sides presented as actual damage. Yeah, but the district judge had no way of knowing where the jury came up with the $11 million. They could have gone for the entire figure that you claim they made, and they could have gone for the lesser figure that Ron said they did. The judge just cut it out $11 million. Well, a function which is clearly a jury function, not a judge function. I agree, Your Honor. And I don't like to harp off the remitted thing, but it seems to me he cut the compensatory damages which the jury had awarded, finding for whatever reason that it was he allowed the $5 million to stay for unjust enrichment. No. For actual damage, and he stated in his ruling that $5 million was his estimate of actual damage. Okay, but you claim you had a lot more than $5 million of damage, and there's a question certainly as to whether or not you had any damage at all from your adversary's point of view. Well, the patent is a valuable thing. I don't think my adversary contests the value of this patent. No, but he claims that you didn't prove that you had any actual damage. He's not harping so much on the unjust enrichment because they have to acknowledge they made money off the patent, but he is claiming that there's nothing in this record that reflects that even if you agree that you were defrauded, that you suffered any actual damage by reason of that fraud. We didn't have an ongoing production yet. We couldn't. This was a new product. So did we lose sales that we otherwise can prove we would have had? No. We did prove that we had the capability to market this to other people. Why is that enough? You know, we had a case years ago, St. Paul versus American Bank, where we said in a fraud case, the question was detrimental reliance. It's not enough to show you had the capability. You had to show that there was a market you would have actually succeeded. You have to put on that kind of evidence. Here it looks to me as though the only evidence of detrimental reliance is the fact that there was reliance. You didn't show you were going to market or could market or there was a market. That evidence seems to be lacking. In the other case, the evidence was pretty strong that there was, in that particular case, a market. There was strong evidence here that there was a market. Braun was willing to pay $1.6 million on the 114, which was a totally untested device in which everyone knew needed substantial further development. Braun's own analysis, Eileen Groves Lane, we cited in our brief, said upon seeing the 114 that it had a potential $65 million present value. The number of valves that have been sold, the gross revenues, the net profit of Braun from precisely what was stolen, the 451 patent, was clearly inevitable. I'm just talking about the damages attributable to fraud that one can segregate from your other general damages, and the figure of $1 million seems to be pulled out of thin air. It looks like a punitive damage award rather than a compensatory damage award for fraud. My apologies. I didn't realize I didn't understand the court's question. I was probably unclear. As to the fraud damages. You can't explain the million on the basis of the evidence, can you? Yes, I can. All right. The 114 in 1992 had a value of $1.6 million to Braun. That A4CRI, they entered into the license agreement and they were willing to pay that amount for it without even making an attempt to develop it. And that for only a license that would be cancelled. In 1994, when the reliance takes place because by that point in time, Rogers had the right to terminate the 114, but he was told that Braun was continuing to develop it. There's no reason to believe that the value of that 114 had in any way diminished, particularly since all Braun bought was a license for 1.6. Rogers had the right even to sell the 114, much less develop it. There was a market out there. Eileen Brooks Lane testified and Ken Raines, the chief engineer for Braun, testified by way of letter that there was a strong market, that the market was seeking needle-free, capless, back-checked balance. I don't think Braun is not claiming there wasn't a market out there. It's a market they were playing into. The question is, did you have some actuary or some damage expert show what, by reason of the alleged fraud, you were prevented from realizing a profit on? We did not have an expert address that specific issue. That's an issue you must prove if you're going to recover money for a fraud count. Those damages can be determined by the jury based upon the value of the 114, and Braun itself set the parameters of those values. By what they were willing to pay in 1992 for a license. Was the jury instructed that they could find the damages on that count based on that scenario? That would be a more specific instruction than a court would normally give, I believe. The court gives a fraud instruction. We've all done it dozens of times, and you go through the fraud, you know, fraud, representation, reasonable reliance, and damages. Correct. There's no damages proof here on this fraud count as far as the briefing is concerned. That Rogers did not attempt to further market the 114 because Rogers was told the 114 was being developed by Braun. This is what you get into. It's a different scenario, but that's the problem with the American bank and other cases that a decision not to market isn't enough to sustain that. I don't believe. You have to show what the market is and what it's worth. But we did. I think there was substantial evidence from the Braun personnel themselves as to what the market was and as to the value of this particular device in the market. And extrapolating their profits from that. And someone extrapolated their profits, which they could have made from this device. Well, once it's established that there is damage, it is not incumbent on a party to prove the precise amount of the damage. I agree with that, but they've got to prove that there were damages. The jury can't pick out of thin air what the damages are because there's a market out there. They've got to have someone lead them to what the reasonable market would have realized for them. Let me ask you just to back paddle on this a little bit. If then of the $16 million original verdict, it was lowered to $5 million. $5 million, you say, represents unjust enrichment or rather the fraud damages? No. What the court stated in its opinion was the $5 million is his estimate of actual damage for the misappropriation. That would be actual damage which you sustained by reason of the fraud. Of the misappropriation.  Okay. So that's the... But then what in effect the judge did was he substituted his idea of what the unjust enrichment of Ron was for what the jury determined it to be. I think he did. How could he do that? He can't, and that's why we think the remitter must be faked. Well, if we're dealing with a remitter, we can't be talking about the merits of this case which you and your adversary have very ably addressed to us. Maybe I can use a different term. That's why we think the order of the court that resulted in a remittance of damages must be vacated. The court had no authority to make the order that it did. It did not purport... But then the remedy is that if that's all true, it's not just an error of law, not just a typical JMOL. If, in fact, it was a true remitter, then your remedy is you get a new trial. If it was a true remitter... And if you get a new trial, then you don't save the parts you like. But it was not a true remitter. By his own words. Very specifically, motion for new trial denied. After saying... The practical fact is this, though. If you're making a true error of law, saying there's no evidence on this point, then I'm reducing the verdict because of this. But your argument is different. Your argument is, no, he was just estimating the damage and substituting his own factual findings for the jury and reducing the award to that based on an estimate. And if that's true, then we're probably into remitter land, if you will, as opposed to a question of a true JMOL. He didn't substitute his knowledge for that of the jury. What he said in two separate instances was, if a wrongdoer cannot profit by his wrong, then $16 million is supported by substantial evidence. What he did say was, essentially, that he finds that Rogers can't recover unjust enrichment. I will award him actual damage. He said, as a matter of law, he can't recover for unjust enrichment. Now, I don't know where that came from. But that is what he said. That is the error. Rogers can recover for unjust enrichment. There was no objection to the instructions. They were properly given. There is none here today. The jury properly performed its function. There's no reason to believe otherwise. What he can't do is vacate the jury's unjust enrichment award by saying that they can't award it. All right. Let me assist a hypothetical. And I won't hold it against you. As a matter of fact, I won't tell a person in this world about this. If you were given the option of taking the $5 million or retrying the case, I take it you would want to retry the case. Or if you don't want to answer, you don't have to. I would have to consult with my client to commit to that. That's a good answer. Take it one step further. If you were to not accept the $5 million, say, look, I want the $16 million, you could try the case again. And if you get less than $16 million on the next appeal, you could then claim that the remediator was in error. And you want the original jury award reinstated. But I'm really at sea as to how we can deal with this case where, number one, you have no damages for the actual loss which you sustained. And the judge appears to me to have said $16 million for unjust enrichment is, for whatever reason, inappropriate. I'm going to lower it to $5 million. Again, I think it's important that I correct that. He didn't say that $16 million is not a good number for unjust enrichment. In fact, he said the opposite. He said there is substantial evidence for the figure of unjust enrichment, and he said if the standard he used to follow that a wrongdoer is that a wrongdoer should not profit from his wrong, then he had no complaint with the $16 million. He just didn't buy that standard. He threw out the unjust enrichment and replaced it with his estimate of actual damage. There's no evidence of damages for actual loss that he could, as far as the breach is concerned. There actually is evidence. He substitutes his estimate of damages, and that's what he's doing, what a jury should be doing. And that makes it, it appears to me, just a true remedy. No, I don't think so. He didn't fault the jury or find that the jury was excessive. What would be the big problem with a new trial? Because this patent was issued in 1995. Rogers and Rozzi, that gives Rogers and Rozzi the right to use it if they own it until 2012. We're already in 2005. They have waited 10 years to try to get their rights confirmed in this patent. We could be back here four years from now. Why did it take so long? It took so long because, first of all, because of the concealment of brawn of their applying for a patent, such that the first legal effort was made shortly after Mr. Rogers found out about it in late 1997. The complaint was filed February of 98. At that point, we're under the control of the court, and we follow the court schedule, and trial occurred in 2003. Now we're here in 2005. It took five years to get a case to trial? It did. Let me ask this. We have, of course, that conference. I don't know what the panel will decide on this case, but assume we decide that this is a remediator by any name. Assume that. What is your position concerning your adversary's response to that assumption that that's fine for your case, but as far as their concern, their case, the patent reassignment and so forth, that their dog is not in that fight? I believe that the other findings made by the jury, legitimately made by the jury, should be affirmed. I don't want it going back. If it did go back, I think it should go back on the issue of damages only. Why should it go back on the whole shooting match? Not only your countersuit, but their original suit. If this is a true remediator, it is a remediator. Because if I ‑‑ I think I've gotten myself confused by your honest questions. I'm trying to sort through it. Let's not use the word jurisdiction, because in fact, we probably do have jurisdiction for the primary appeal, but there's a good argument that it makes the judge's second, what we'll call the equitable proceeding, because that's what he did in this case. Perhaps it should have been something else, but it may make that moot, because it was predicated on his post‑trial ruling on the post‑trial motion. So if it's a true remediator, you've got to make a choice, and you go back for a new trial. It doesn't make much sense that the independent patent reassignment would stand. I would think in the interest of judicial economy and in the interest of justice that the other findings that are appropriately made should stand, and the remediator should go only to the issue of damages. Let's talk briefly. I know we're way over time, but before you sit down, I wanted to ask you about the patent reassignment. It's hard for me to see how California statutes permit that remedy. I don't see any case that really supports it outside the language in the federal circuit which predates the statute. Our cases pretty clearly indicate that the common law remedies pre‑statute don't survive. What's your best argument on that? Unfortunately, I have about three. It was Broad that asked this court to determine ownership of the patent. It was the court's charge both under the complaint and the cross-complaint to determine who owned the patent. The court made that determination who has all rights, title, and interest in the patent. The UTSA does not preempt other remedies or other causes of action not based on this appropriation. It does not supplant common law remedies, and the cases are multiple not only throughout the nation but in California as well regarding patent reassignment. The Pendleton case is directly on point. It's in the federal code sections 2223 and 2224, I think. Even assuming that there is a remedy of reassignment, assumed for the purpose of argument, you put $15,000 into this show. They put a heck of a lot more money into it. How does the district court reasonably conclude that you're entitled to 100% of the patent on a reassignment when they have to be entitled to something here? The district court goes through an analysis and its findings of fact under the license agreement. Broad cannot convert proprietary information of Rogers by fraud or concealment or in any other fashion. They can only do it by the authority of Rogers. They cannot take VIR as their representative. So why isn't a damage remedy adequate? Because Rogers owns the patent. He owns the intellectual property that led to the patent. It was Rogers' consultants, and that's the word in that agent that he uses in his findings of fact, that VIR at all times remained the consultant to Rogers. VIR was the repository of Rogers' confidential proprietary information. Braun, under the contract, was not allowed to take that to its own use, and they did. Everything that VIR developed rightly belonged to Rogers according to the findings of fact made by the court below.  A wrongdoer can't take possession of a property that doesn't belong to him by theft, by misappropriation, or by fraud. That's fundamental in the law, whether it be a house, a car, or in this case, intellectual property. We can't condone the acts of that wrongdoer. In fact, that would make Braun's plan as put forth in 1995 when they had their meeting and decided to do all this, that would justify what they did. Why not? Why offer it to Rogers? All he'll get is a royalty anyway. Well, that's not the law, and hopefully never will be, that a thief takes title to the stolen property if he's successful enough at it. He never takes title. And the court is not powerless to turn it back. There's an issue on our cross-appeal we haven't touched on. If I may have just two minutes, perhaps the court doesn't care to hear it. The license agreement was civil spotting, pulled from nowhere. It was never fled. It was never even requested by Braun. It came out and it eviscerated all, every property right that Rogers has. It totally negated the transfer, and it's not authorized under California statute, federal statute, common law, or the UTSA. The license agreement, the order for the license agreement should be reversed. I had it more than that. I thank the court for its generosity. I'll be very brief. I have to be. First on damages, we guide the court to exert some. We're not going to limit you.  I'll try not to abuse your kindness. You're also a court of equity. I'm very grateful. I'll speak a little bit more slowly, but I'll try not to burden the court. We guide the court to excerpts of record, page 852, where the judge specifically found this goes to the damages issue and what was going on here. Quote, and this is in our brief, the court finds that the jury improperly sought to punish Braun through the compensatory damages award, so we're talking about misappropriation, not fraud, based on profits. Improperly sought to punish. Our brothers on the other side chose not to even address this point in their reply brief. We put it before the court that there needs to be a new trial for a variety of reasons, but here is another one. As to remediature, I believe the court's question suggests that the appropriate approach by the judiciary on review is to examine what the court below actually did. And as we said before, and I don't think that I've heard a response to this particular point that the judge, Judge Brewster, actually engaged in a way. What my brother refers to as to the $16 million as justified is a much earlier reflection on the record. It is not to be found in that order that grants what we believe was remediature and functionally is a remediature, and again, he uses even the words remit. He said specifically in his argument, my brother Keyes, that the judge, quote, calculated what he believed was correct. I quote Mr. Keyes, very able lawyer, said to this court, the judge Brewster calculated what he believed to be the correct. That's classic remediature language. Point two. Much has been said about this document, phase one. Mr. Rogers, through his able trial counsel, had the opportunity to stand on this. One reviews the record and sees that's not what was done. The evolving theory of the trade secret evolved and was transformed into mix and match. Mix and match was what was argued at summary judgment. We said that's wrong, that violates IMAX. We moved in limine, specifically and expressly invoking the principle, which is the key, but the principle embodied in IMAX. Their theory at trial was mix and match, and there's a very good reason that they needed to mix and match. He held up figure one. Figure one or drawing one is not the 451 patent. There are elements in any valve. If you bring a valve in the medical device, it will have elements. What is undisputed is that every one of these elements or building blocks was in the public domain. And Judge Cowan's point about this process, and we honor the process, but it was a very limited process of $15,000. And then the language about thievery. I beg to disagree in light of the fact that it's undisputed that with Mr. Rogers' knowledge, he was quite content to see the relationship with VIR move to Braun in terms of he was delighted for Braun to pick up the tab. That's the point. And in this industry, if a consultant, although the judge bought into an agency theory, which is a jury issue, a Seventh Amendment issue, but if the consultant is working for Braun and Braun is paying the tab, that explains why the assignment of the patent rights by the four engineers in Santa Barbara, not in San Diego, not Mr. Rogers, but the four engineers in Santa Barbara working for VIR and then Claude Vidal himself said, uncontradicted testimony, my client became Braun. What is your response to their position that, look, you went to discovery, you went to the jury, and you never said to the judge, Judge, let's stop the music. We want to know with particularity and specificity what the trade secret is that they claim we misappropriated. Your Honor, it was so clear. I referred earlier to our motion in lemony number seven. In lemony, okay. So that's before trial. Now, that's when we saw this evolving theory. But you wanted to, well, and that was denied. It was denied. We said IMAX. They are evolving the theory. They are moving to mix and match. Mix and match cannot be done under the law, Your Honor, and the judge denied our motion. Now, that was pre-trial. But what had happened is, again, we see the shifting. The shifting occurred even here today. Now we're back to phase one and no mixing and matching. But that was not what was argued before the jury. How about objection to the charge to the jury? You didn't specifically say to we object because there's no specificity as to what the trade secret is that we incorporated into 451. It was utterly fruitless. We did have, in fact, other jury instructions that had been proposed. But, Your Honor, this was, there were long colloquies with Judge Brewster on this. And this was invited error. My learned brother on the other side said I do not have to stand on phase one. I do not have to stand on drawings one and three. I get to mix and match. He needed, as he saw it, I think, to mix and match to get to the 451, which had elements that VIR developed in phase two that Braun paid for. Our point is that's a jury issue. I don't want to convince you here, I would love to, to convince you here today that the interrelationship, and I have one final point, is something that you can decide as a matter of law. Our submission is it was a jury issue. And when my brother speaks of the judge found this and the judge found that, we invite the court to findings 47 through 52, which are the judge's findings of fact at the conclusion of what he called the caboose trial. That's not disrespectful. That's what Judge Brewster called it. This is our caboose trial. Where was the jury? The jury had gone. And he then proceeds to make these findings with no citation to the record. And there's a reason for that. We tried to be respectful in our brief, but we've been firm. Zero support for the idea that during phase two, the critical phase that we were paying for, that there was, in fact, a relationship with R&R. Now, if they thought that there was or that we had somehow violated the contract, why did they not bring an action in contract? They instead brought an action on misappropriation. What is your response to their position is that 451 and all the other phases after phase one are just a natural progression and lineage and evolution of the original phase one, which they paid? But it, again, ignores exactly what two phases. It ignores what phase one is. Phase one, and he is now trumpeting phase one, is a sketch done in four weeks, three weeks, that combines elements that are all in the public domain. And then that begins a process. The claim is that both experts claim that it was not in the public domain, that it was your expert and his expert said it was. The drawing itself, I'm drawing a distinction between the elements and the combination. Your Honor, if he had stuck with drawing number one in phase one is our trade secret, I don't think we would have an IMAX. It would be a very different IMAX. I don't want to definitively argue because he didn't. He chose a mix and match kind of theory. So he has a definitional problem for starters. It still brings us back to what is phase one and then what is phase two. And the fact that phase two is where the intellectual work was done that generated in the 451 and that we paid for it, and he's speaking about theft, is very, very odd. When that costs $266,000 and then well over, and all this is undisputed. So we think, with all due respect, that phase one, that the trial, the court, and I will conclude with the subject of the court's questions. This court can conclude, as a matter of law, that they lose. As a matter of law, because they fail to identify the trade secret with sufficient particularity, IMAX controls. And IMAX is grounded in the structure of the statute. It could also conclude as a matter of law that the assignment is utterly impermissible. And I heard my brother's answer. I did not hear him citing to principles of California law, certainly not the uniform trade secrets. He chose to bring a trade secrets case and not an assignment case and a contract case. Had he brought that, perhaps assignment, depending on the evidence, would be a permissible remedy. But he did not. He chose to bring a trade secrets case. Our final point is, so many of these issues should have gone to the jury. And the Seventh Amendment jury trial is foundational to our submission here today. I thank the court for its attention. Thank you.
judges: Pregerson, Cowen, Thomas